IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN STRAWBRIDGE | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 08-2937 |
| JOHN E. POTTER, | : | |
| POSTMASTER GENERAL | : | |

**SURRICK, J.**                                      **JULY ___22___, 2009**

## MEMORANDUM

Presently before the Court is the Motion of Defendant John E. Potter, Postmaster General,

for Summary Judgment.  (Doc. No. 15.)  For the following reasons, the Motion will be granted.

## I.        BACKGROUND

### A.        Employment and Injury as a Letter Carrier

Karen Strawbridge ("Plaintiff") is a letter carrier with the United States Postal Services

("USPS") in Philadelphia.  (Doc. No. 15, Ex. A at 7, 11, 65 (Pl.'s Dep., Apr. 14, 2009).)

Plaintiff began working for the USPS in November 1996.  (*Id.* at 7.)  On September 3, 1997,

Plaintiff injured her neck, right shoulder, and arm while delivering mail.  (*Id.* at 32, 56-58; *see

also* Doc. No. 15, Ex. I; Doc. No. 19, Ex. B.)  For two weeks after being injured, Plaintiff worked

at the Richmond Station answering telephones.  (Pl.'s Dep. at 58.)

Letter carriers have many duties.  (Pl.'s Dep. at 27.)  Primary among those duties are

sorting (or, in USPS parlance, "casing") mail for their routes and delivering the mail.  (Doc. No.

26, Ex. B ¶ 3 (Decl. of J. Breslin); Pl.'s Dep. at 27-28, 36.)  Each morning, before starting

delivery, letter carriers spend approximately one-and-a-half hours casing and bundling the mail

for their routes.  (Decl. of J. Breslin ¶ 4; Pl.'s Dep. at 31.)  After casing, letter carriers spend

approximately six-and-a-half to seven hours delivering the mail, which they accomplish through a combination of walking, driving, and climbing steps.  (Pl.'s Dep. at 31-32; Decl. of J. Breslin ¶ 4.)  Letter carriers must be able to lift and carry bags of mail and parcels ranging in weight from 25 to 70 pounds, with the bags getting lighter as the day progresses.  (*Id.*)

Casing and delivering mail are considered to be two essential functions of letter carriers. (Pl.'s Dep. at 55; Decl. of J. Breslin ¶¶ 3, 5, 9; Doc. No. 26, Ex. C ¶¶ 3, 8 (Decl. of A.C. Disante).)  Due to Plaintiff's injury, she cannot case or deliver mail.  (Pl.'s Dep. at 32, 34, 36, 105-06; Decl. of J. Breslin ¶ 5; Decl. of A.C. Disante ¶ 3.)  There is no accommodation that the USPS could devise that would allow Plaintiff to case mail.  (Pl.'s Dep. at 36.)  Nor is there any accommodation that would allow Plaintiff to deliver mail along a full, regular route.  (*Id.* at 35.) Plaintiff has never asked her supervisors for accommodations that would allow her to case and deliver mail.  (Decl. of J. Breslin ¶ 5; Decl. of A.C. Disante ¶ 3.)

After her injury, Plaintiff was placed on limited duty by the USPS.  (Doc. No. 20 ¶ 4.) "Limited duty assignments are provided to employees during the recovery process when the effects of the injury are considered temporary."  (Doc. No. 19, Ex. C § 546.141 ("Employee Benefits Injury Compensation Program").)  Nevertheless, throughout her employment with the USPS, Plaintiff's job title has remained "letter carrier."  (Pl.'s Dep. at 11, 65.)  Plaintiff's salary range and union membership are based upon her position as a letter carrier.  (*Id.* at 11.)

### B.    Modified Rehabilitation Program Positions

In April 2000, Plaintiff reached maximum medical improvement, according to her physician, Dr. Ivan A. Donor.  (Doc. No. 26, Ex. D.)  Dr. Donor listed Plaintiff's medical and physical limitations as:  (1) no lifting above shoulder level on the right arm; (2) no lifting or

2

carrying more than 20 pounds; (3) no driving at work; and (4) no casing.  (*Id.*; *see also* Pl.'s Dep. at 105.)  Subsequently, Plaintiff's lifting and carrying restrictions were further limited to five to ten pounds.  (Doc. No. 15, Ex. P; Pl.'s Dep. at 105.)  In July 2000, Plaintiff was placed in the USPS Rehabilitation Program.  (Doc. No. 15, Exs. F-I (rehabilitation job offers and acceptances).)

The Rehabilitation Program "was developed to fulfill the USPS legal obligation to provide work for injured-on-duty (IOD) employees" (Doc. No. 15, Ex. E at 259), and is operated under the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8105 *et seq.*[1]  (Doc. No. 15, Ex. E at 260.)  Under the Rehabilitation Program, the USPS developed an "in-house rehabilitation program . . . as a means of facilitating the proper placement and accommodation of current employees with permanent partial disabilities resulting from injuries on duty."  (*Id.* at 259.)  The USPS attempts "to reemploy or reassign IOD employees with permanent partial disabilities to positions consistent with their medical work restrictions."  (*Id.* at 260; *see also* Decl. of J. Breslin ¶ 7.)  In identifying a suitable modified job assignment, the USPS reviews the injured employee's medically defined work restrictions and considers whether the employee can be assigned to the employee's current position, to another authorized position, or to a residual vacancy.  (Doc. No. 15, Ex. E at 269.)  The employee must be able to perform the core duties of

---

[1] FECA "establishes a federal workers' compensation program for employees who suffer a 'disability' as a result of an on-the-job injury."  *Rolland v. Potter*, 492 F.3d 45, 48 (1st Cir. 2007).  "Among other things, FECA requires federal agencies to place employees in their former positions, or in equivalent positions, following recovery from compensable injuries."  *Id.* (citing 5 U.S.C. § 8151)).  "To fulfil its FECA obligations to employees who suffer compensable injuries, the USPS developed an injury compensation program that specifically addresses the reassignment of employees injured on the job."  *Id.*  "Under this program, employees whose on-the-job injuries result in permanent restrictions are placed into new rehabilitation positions through the USPS's Rehabilitation Program."  *Id.*

these positions with only minor modifications.  (*Id.*)  If an employee's restrictions prevent any of

the above placements, "individual tasks must be identified and combined to develop a modified

assignment consistent with the employee's medical restrictions.  These tasks are usually

subfunctions and may be from multiple positions."  (*Id.*)  Plaintiff's modified positions are not

"separately funded, official position[s] within the United States Postal Service."  (Decl. of J.

Breslin ¶ 9; Decl. of A.C. Disante ¶ 8.)

After being placed in the Rehabilitation Program, Plaintiff accepted rehabilitation job

offers at Nicetown Station (Doc. No. 26, Ex. F (dated July 13, 2000)) and Olney Station (*id.*, Ex.

G-I (dated Dec. 20, 2000; Sep. 24, 2001; Oct. 2, 2006)).[2]  Although Plaintiff's position title

remained "letter carrier," Plaintiff's modified assignments at these stations included:  working

with the USPS's Computerized Forwarding System ("CFS"); calculating monthly mileage for

letter carriers; entering information on the computer; "key-desk" work, which involved checking

in the registered and certified mail from letter carriers at the end of the night; and answering

phones.  (Pl.'s Dep. at 22, 24, 70-72; Decl. of J. Breslin ¶ 8; Decl. of A.C. Disante ¶¶ 6, 7.)  CFS

is "[a] system used by the USPS to provide mail redirection and address correction services."

(Doc. No. 26, Ex. J at A-3.)  Plaintiff's CFS duties included making copies of completed Change

of Address cards, placing the appropriate extract codes on envelopes, and giving updated labels

to the letter carriers.  (Pl.'s Dep. at 24.)  Plaintiff was also asked to consolidate change of address

form information, and to create master lists of changed addresses for letter carriers.  (Decl. of

---

[2] Plaintiff characterizes the September 24, 2001 rehabilitation job offer for a position at Olney Station as "a permanent rehabilitation position."  (Doc. No. 20 at 3.)  There is nothing in the record that allows this Court to infer that the rehabilitation job offer for the Olney Station position was permanent or in any way different than Plaintiff's other modified assignments.

A.C. Disante ¶ 7.)  If Plaintiff missed a day of such work, no one completed her work while she was gone.  (Pl.'s Dep. at 86.)

During her tenure at Olney Station, Plaintiff's supervisors found it difficult to find 40 hours a week of work for her.  (Decl. of J. Breslin ¶ 6; Decl. of A.C. Disante ¶ 4.)  Plaintiff was often not busy while at work.  (Decl. of J. Breslin ¶ 13.)  Nevertheless, Plaintiff's station manager "did [his] best to cobble together enough work to provide [Plaintiff] with some overtime hours."  (Decl. of A.C. Disante ¶ 9.)  Plaintiff generally worked overtime for 4 to 6 hours every Tuesday, one of her days off.  (Pl.'s Dep. at 92-93.)

### C.     Change in Overtime Usage Enforcement

Even though the USPS overtime policy was that overtime should only be given to employees when justified, the policy was not enforced.  (Doc. No. 15, Ex. K ¶ 7 (Decl. of M. McKenna).)  However, with the USPS in Philadelphia losing revenue because of a significant drop in the volume of mail that was processed (*id.* ¶ 4), USPS officials were forced to address concerns about overtime usage (*id.* ¶¶ 5-6).  Unnecessary overtime usage by disabled and non-disabled USPS employees was costing Philadelphia post offices money.  (*Id.* ¶ 5.)  As a result, Philadelphia Postmaster Judith Martin held a staff meeting on July 18, 2006 with area managers to address the financial situation.  (*Id.* ¶ 9.)  After the meeting, Postmaster Martin emailed the area managers a list of "absolutes" that they had developed for Philadelphia, including:

> 2.     ABSOLUTE – there will be ZERO overtime used to case open routes.  All casing will be on under time.
> . . .
>
> 3.     All offices will utilize carriers on overtime using the WINDOW of OPERATIONS which is 5 pm in the city of Philadelphia.
> . . .

4.      No Limited Duty Carrier will work overtime unless they are able to perform the core functions of their assignment which is delivering mail.  There is absolutely no mail in the city to justify overtime in casing mail.
. . .

6.      By 12:00 noon each day the Station Manager will email the area manager the name of every employee and the amount of overtime authorized.  They will notate by the amount how much is POT.  The following morning the area manager will compare the amount authorized and amount used.

(Doc. No. 15, Ex. N.)  The overtime rules memorialized by Postmaster Martin applied to both

injured and non-injured employees.  (Decl. M. McKenna ¶¶ 10-12.)

Accordingly, beginning in October 2006, Plaintiff's supervisors no longer allowed her to

work overtime on her days off since there "simply was not enough work within her restrictions to

justify overtime pay."  (Decl. of A.C. Disante ¶ 12; *see also* Pl.'s Dep. at 85.)  There were other

injured, light-duty and limited-duty employees at Olney Station who continued to receive

overtime payments because they could perform tasks that justified overtime, such as delivering

mail, driving to the hub center to pick up mail, and driving mail to letter carriers on the street.

(Decl. of A.C. Disante ¶ 13; *see also* Pl.'s Dep. at 91, 99.)  Plaintiff could not perform these

tasks.  (Decl. of A.C. Disante ¶ 13; Pl.'s Dep. at 91.)

On October 11, 2006, Plaintiff filed an informal EEO complaint alleging discrimination

on the basis of her disability, complaining about the reduction in her overtime hours.  (Doc. No.

20 ¶ 11).  On October 28, 2006, Plaintiff filed a formal EEO complaint.  (*Id.*; *see also* Decl. of J.

Breslin ¶ 10; Decl. of A.C. Disante ¶ 14.)

**D.      Transfer out of Olney Station**

In March 2007, changes in passport requirements for air travel generated a massive

amount of passport applications that needed to be processed.  (Doc. No. 15, Ex. P ¶ 3 (Decl. of R. Bethune); *id.*, Ex. R ("Meeting the Challenge: Update on Passport Production" dated Mar. 13, 2007); *id.*, Ex. S ("State Department Ramps Up Passport Production To Meet Record Demand" dated Mar. 23, 2007).)  The Philadelphia Main Post Office, also known as Main Office Delivery ("MOD"), was responsible for processing 80% of these passports.  (Decl. of R. Bethune ¶ 3.)  Postmaster Martin asked Philadelphia station managers to send injured employees who were not being used productively at their assigned stations to MOD to assist with the passport processing.  (*Id.* ¶ 4.)  MOD was then located at 30th and Market Streets in Philadelphia.[3]  (*Id.* ¶ 2.)  This was not the first time that the USPS sought injured employees for temporary assignments at various stations.  (Decl. of J. Breslin ¶¶ 15-19.)

On March 23, 2007, Plaintiff's Olney Station supervisor, Station Manager Alexander C. Disante, received a request from his Area Manager, Eric Coleman, to select two injured employees to send to MOD.  (Decl. of A.C. Disante ¶ 16.)  Disante offered the position to Plaintiff and another injured employee, John Luckiewicz, because (1) there was not enough work at Olney Station to provide Plaintiff and Luckiewicz with eight hours of work each day; (2) the passport work at MOD would provide them with eight hours of work each day within their restrictions; and (3) they were the two most junior employees at Olney Station.  (*Id.* ¶ 17.)  Plaintiff accepted the position "under protest."  (Doc. No. 15, Ex. T ("Offer of Modified Assignment (Limited Duty)" dated Mar. 23, 2007).)

On March 26, 2007, Plaintiff was transferred to MOD.  (Pl.'s Dep. at 85; Decl. of A.C. Disante ¶ 16.)  By April 2007, there were many injured employees who had been transferred to

---

[3] MOD is now located at 3000 Chestnut Street in Philadelphia.  (Decl. of R. Bethune ¶ 1.)

MOD in addition to Plaintiff.  (Decl. of R. Bethune ¶¶ 5-6.; *see also* Decl. of J. Breslin ¶ 21.)

The passport work consisted mainly of sitting, scanning express priority mail and passport mail,

and assisting customers with filling out passport applications.  (Doc. No. 15, Ex. O ¶ 6 (Decl. of

E. Coleman); *id.*, Ex. T.)  Plaintiff performed the passport duties at MOD well and subsequently

trained other employees in the passport work.  (Decl. of R. Bethune ¶ 7.)  While at MOD,

Plaintiff received overtime almost daily.  (Pl.'s Dep. at 85-86.)

On June 13, 2007, Plaintiff filed a second EEO complaint alleging that her transfer to

MOD constituted retaliation by her supervisors at Olney Station for filing the October 2006 EEO

complaint.  (Doc. No. 15 at 9.)

In August 2008, the passport processing operation moved to the Philadelphia Processing

and Distribution Center and Plaintiff trained employees at the Center for several weeks.  (Decl.

of R. Bethune ¶ 7; Pl.'s Dep. at 86.)  The Center already had employees to perform the passport

work and, as a result, Plaintiff was transferred back to Olney Station.  (Decl. of R. Bethune ¶ 9.)

### E.     Return to Olney Station

Plaintiff returned to Olney Station in September 2008.  (Pl.'s Dep. at 17-18, 86.)  Her

duties included accepting passport applications and answering phones.  (*Id.* at 17-19, 147.)  For

three days of the week, Plaintiff worked eight hours a day; she worked four hours a day once a

week; and she worked six hours each Saturday.  (*Id.* at 147.)  Because Saturdays were very busy,

Plaintiff believed that she could work longer hours on Saturdays.  (*Id.*)  Since Plaintiff did not

work 40 hours per week (*id.*), workers' compensation made up the difference (Decl. of A.C.

Disante ¶ 18.)  In her response to Defendant's Motion for Summary Judgment, Plaintiff notes

that "[a] few days after her deposition on April 14, 2009, [Plaintiff] was told that there was no

8

work. . . .  Since then, Plaintiff sits at home where she awaits to hear from Defendant."  (Doc. No. 20 ¶ 15.)

### F.    Federal Court Proceedings

Plaintiff filed the instant Complaint on June 24, 2008.  (Doc. No. 1.)  In Count I, Plaintiff brings a Rehabilitation Act claim for denial of accommodation and transfer.  Count I alleges that Defendant "involuntarily transferred [Plaintiff] unlawfully due to her disability and or perceived disability and denied her request to remain at the Olney Station as an accommodation to her physical disability in violation of 29 U.S.C. § 701 et seq."  (*Id.* ¶ 39.)  In Count II, Plaintiff brings a retaliation claim under the Rehabilitation Act.  Count II alleges that "Defendant retaliated against [Plaintiff] when the Agency involuntarily transferred her again after she filed her first EEO Complaint."  (*Id.* ¶ 41.)  In Count III, Plaintiff brings a disparate treatment claim, alleging that Defendant "did not allow [Plaintiff] to work overtime from September 2006 to July 2007, and on other periods thereafter to the present, because of her disability and or perceived disability while allowing other workers to work overtime."  (*Id.* ¶ 42.)  On all counts, Plaintiff demands the following as relief:

> a judgment order requiring the Defendant return [Plaintiff], to the Olney Station, pay retroactive back pay which includes lost overtime and seniority benefits starting from September 2006; or front pay, in lieu of reinstatement; award compensatory damages for pain and suffering, emotional distress, humiliation, embarrassment, loss of self-esteem; including the loss of compensation, interest, benefits and pension; award attorney's fees for the cost of representation throughout the pendency of this claim, including other costs and disbursements of this lawsuit; interest on all damages; negative tax consequence and other such legal and equitable relief as this Court deems just and proper under the circumstances.

(*Id.* at unnumbered 7 ("Damages as to all Counts").)

On November 14, 2008, Plaintiff moved to consolidate her case with that of another

plaintiff, John Luckiewicz, who also alleged discriminatory treatment on the basis of disability and retaliation by the USPS.  (Doc. No. 9.)  We denied Plaintiff's request, finding that "the two actions will require significant individualized analyses that would make consolidation impractical and inconvenient.  While the legal issues and witnesses may overlap, the evidence in each case will be different."  (Doc. No. 12 at 2 n.1.)

On May 15, 2009, Defendant filed a Motion for Summary Judgment.  (Doc. No. 15.) Plaintiff filed a response in opposition to Defendants' Motion.  (Doc. No. 20.)[4]  After receiving permission from the Court, Defendant subsequently filed a reply brief (Doc. No. 23), and Plaintiff filed a sur-reply (Doc. No. 26).  The matter is now ripe for disposition.

## II.   LEGAL STANDARD

A moving party is entitled to summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003).  Where the non-moving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by "showing" the court that there is no evidence in the record supporting the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  Once the moving party carries this initial burden, the non-moving party must set forth specific facts showing that there is

---

[4] Plaintiff filed a response on June 5, 2009 (Doc. No. 18), and several days later filed a corrected response (Doc. No. 20).  We will refer to the corrected response.

a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2) (stating that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial"); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 857-58 (3d Cir. 2000) (explaining that once the movant has demonstrated an absence of a genuine issue of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (noting that plaintiffs cannot avert summary judgment with speculation or by resting on the allegations in the pleadings). "If the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial,' summary judgment is proper as such a failure 'necessarily renders all other facts immaterial.'" *Jakimas v. Hoffmann La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Celotex*, 477 U.S. at 322-23). Courts must draw all reasonable inferences from the record in favor of the non-movant. *Knabe v. Boury Corp.*, 114 F.3d 407, 410 n.4 (3d Cir. 1997). Moreover, courts must not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc., v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.   LEGAL ANALYSIS

Plaintiff brings her claims under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*,

generally.[5]  (Doc. No. 1 ¶ 1.)  Defendant moves for summary judgment on all counts, arguing:

(1) Plaintiff is not a "qualified individual" under the Rehabilitation Act; (2) the USPS did not fail

to accommodate Plaintiff; (3) the USPS did not subject Plaintiff to discriminatory transfer;

(4) Plaintiff was not subject to disparate treatment; and (5) Plaintiff cannot establish a causal

connection between her EEO complaints and her transfer to MOD.  (Doc. No. 15 at 2, 12-28.)

"The Rehabilitation Act expressly makes the standards set forth in the 1990 Americans

with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, applicable to federal employers and to

employers receiving federal funding."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007)

---

[5] Plaintiff does not specify under which section of the Rehabilitation Act she is suing.
"Federal agencies may, by the terms of the Rehabilitation Act, be sued for violation of either
section 501 or 504 of the Act."  *Spence v. Straw*, 54 F.3d 196, 199 (3d Cir. 1995).  However,
because Title VII remedies are available in actions under section 501, "a party is barred from
suing a federal agency for violation of section 501 if he or she has failed to exhaust
administrative remedies under Title VII."  *Id.*  The Third Circuit has also held that "a plaintiff
must exhaust Title VII remedies before bringing suit under sections 504 and 505(a)(2) of the
Rehabilitation Act, just as he or she must before suing under section 501 and 505(a)(1) of the
Act."  *Id.* at 201.  Accordingly, "[b]efore an aggrieved employee may bring [a Rehabilitation
Act] claim in court against a federal employer, he must file a claim with the EEOC."  *Wilson v.
MVM, Inc.*, 475 F.3d 166, 173 (3d Cir. 2007) (citing 29 C.F.R. § 1614.105).  "Therefore, a court
need not pass upon the merits of a plaintiff's substantive claim until it satisfies itself that the
claim is properly before it, including determining whether the plaintiff properly exhausted
administrative remedies."  *Wilson*, 475 F.3d at 173.  However, "the exhaustion requirements of
the [Rehabilitation Act] are prudential," not jurisdictional.  *Id.* at 175.  Accordingly, "[f]ailure to
exhaust administrative remedies in employment discrimination actions is an affirmative defense
and thus 'the defendant bears the burden of pleading and proving that the plaintiff has failed to
exhaust administrative remedies."  *Kondas v. Potter*, No. 05-1861, 2008 U.S. Dist. LEXIS
71956, at *17-18 (M.D. Pa. Sep. 4, 2008) (quoting *Williams v. Runyon*, 130 F.3d 568, 573 (3d
Cir. 1997)).

Here, neither party addressed the issue of exhaustion.  Both parties mention Plaintiff's
filing of at least one EEO complaint, which forms the basis of Plaintiff's retaliation claim, but
neither party attached the complaint to their filings.  We have no further information about
Plaintiff's exhaustion of administrative remedies.  Since Defendant did not raise failure to
exhaust as an affirmative defense, even if Plaintiff has failed to exhaust her administrative
remedies, we retain jurisdiction over this case and will proceed to review the case on the merits.

(citing 29 U.S.C. § 791(g)).  Courts examine claims brought pursuant to the Rehabilitation Act

under the *McDonnell Douglas* burden-shifting framework.  *Id.* at 185 (citing *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 793-94 (1973)).

A.      **Discrimination**[6]

Plaintiff brings two types of discrimination claims under the Rehabilitation Act.  Plaintiff

claims that Defendant engaged in disparate treatment discrimination on the basis of Plaintiff's

disability when it stopped her from working overtime because she was an employee on limited

duty.  (Doc. No. 20 at 19.)  Plaintiff also claims that Defendant discriminated when it denied her

accommodation at Olney Station and involuntarily transferred her to MOD on March 26, 2007.

(*Id.* at 29.)

"The Rehabilitation Act forbids employers from discriminating against persons with

disabilities in matters of hiring, placement, or advancement."  *Shiring v. Runyon*, 90 F.3d 827,

830-31 (3d Cir. 1996).  However, "[e]mployers cannot be obligated to employ persons who are

incapable of performing the necessary duties of the job."  *Id.* at 831.  In order to make out a

prima facie case of discrimination under the Rehabilitation Act, a plaintiff bears the burden of

demonstrating:

> (1) that he or she has a disability, (2) that he or she is otherwise qualified to perform
> the essential functions of the job, with or without reasonable accommodations by the
> employer; and (3) that he or she was nonetheless terminated or otherwise prevented
> from performing the job.   The plaintiff must make a prima facie showing that

---

[6] Plaintiff appears to be asserting her disparate treatment claim under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Title I of the Civil Rights Act of 1991,
42 U.S.C. § 1981.  (*See* Doc. No. 1 ¶ 1.)  However, "the Rehabilitation Act provides the
exclusive means by which a litigant may raise claims of discrimination on the basis of handicap
by federal agencies."  *Spence*, 54 F.3d at 202.  We will address Plaintiff's disparate treatment
claim as a claim of discrimination under the Rehabilitation Act.

reasonable accommodation is possible.

*Id.* "If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer." *Id.*

Similarly, to establish a prima facie case of disparate treatment under the Rehabilitation Act, a plaintiff must show that

> "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination."

*Galle v. Dep't of Gen. Servs.*, No. 02-4622, 2003 U.S. Dist. LEXIS 4548, at *10 (E.D. Pa. Mar. 18, 2003) (quoting *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000)).

Because Defendant concedes for the purposes of this motion that Plaintiff is disabled (Doc. No. 15 at 12 n.6), the issue here is whether Plaintiff is "otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer . . . ." *Shiring*, 90 F.3d at 831. "[T]he burden is on the employee to prove that [she] is an otherwise qualified individual." *Id.* at 832 (internal quotation marks omitted). The Third Circuit has established a two-prong test to determine whether someone is a qualified individual under the Rehabilitation Act:

> First, a court must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. Second, the court must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.

*Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).

There is no dispute that Plaintiff satisfies the first prong of the "qualified individual" test, that is, that she satisfies the prerequisites for the position.  However, Defendant argues that Plaintiff "cannot perform two essential functions of her official job as a letter carrier, which are the casing and delivery of mail."  (Doc. No. 15 at 2.)  Defendant argues that Plaintiff's "made up assignments do not render her a qualified individual because these are not vacant, funded, official positions within the USPS."  (*Id.*)  In addition, Defendant argues that "the USPS did not fail to accommodate plaintiff as required under the Act because she concedes that she did not ask for anything that would allow her to case or deliver mail, and that nothing exists that would allow her to perform these essential functions."  (*Id.*.)

Plaintiff responds that she is a "qualified individual" because she "performed duties and functions of the rehabilitation position since 2001."  (Doc. No. 20 at 30.)  Plaintiff points the Court to the rehabilitation job offers of September 24, 2001, and October 2, 2006, to demonstrate the essential functions of Plaintiff's job.  (*Id.*)  The September 24, 2001 job offer states that the title of the position is "Carrier" and that the duties of the position are to "Do CFS Mail – Sedentary Work."  (Doc. No. 15, Ex. H.)  The October 2, 2006 "Offer of Modified Assignment (Limited Duty)" states that the modified position title is "[Limited] Carrier" and that the duties will consist of processing A-Z mail and computer work for A-Z mail.  (*Id.*, Ex. I.)  Plaintiff states that she "performed fully the duties of her rehabilitation position."  (Doc. No. 20 at 32.)

### 1.   *Essential Functions of the Job*

Preliminarily, we must determine what job we should consider when analyzing whether Plaintiff could perform the essential functions of that job.  Defendant argues that the relevant position is "letter carrier," because this is the position for which Plaintiff was hired and this

remained Plaintiff's title throughout her tenure at the USPS.  Plaintiff argues that she could

perform the essential functions of her rehabilitation positions, and that those positions are the

appropriate benchmarks for the essential functions analysis.

We agree with Defendant.  The fact that Plaintiff was able to perform her CFS duties –

and the fact that the USPS allowed her to perform those duties for several years – does not make

Plaintiff a "qualified individual" under the Rehabilitation Act.  The Third Circuit decision in

*Shiring* is instructive in this regard.  In *Shiring*, the plaintiff was hired by the USPS as a part-time

flexible ("PTF") letter carrier.  90 F.2d at 829.  After the plaintiff began experiencing severe foot

pain while delivering the mail, the USPS placed him on light duty work.  *Id.*  The plaintiff was

assigned to casing mail for all carrier routes.  *Id.*  The plaintiff temporarily returned to delivering

mail as a letter carrier, but because of his condition, the USPS returned him to the same modified

light duty position of casing mail.  *Id.* at 829-30.  Several years later, the USPS determined that

there was nothing more available for the plaintiff consistent with his medical restrictions.  *Id.* at

830.  The plaintiff argued that he was otherwise qualified for the position of PTF letter carrier

because he had been able to perform the duties of the modified assignment.  *Id.* at 831.  The court

held that "[t]he 'casing' position to which he was temporarily assigned was not an official

position, but had been created by the Postal Service to give [the plaintiff] something to do on a

temporary basis."  *Id.*  Therefore, the fact that the plaintiff "would have been qualified to perform

the requirements of such a position does not help his case because under the Act employers are

not required to create positions specifically for the handicapped employee."  *Id.* (citing *Fedro v.

Reno*, 21 F.3d 1391, 1395 (7th Cir. 1994)).

As in *Shiring*, the CFS work that Plaintiff performed at Olney Station did not constitute

16

an official position.  Rather, her various rehabilitation positions were created precisely because her injuries prevented Plaintiff from performing the duties of her official position:  letter carrier. Since the USPS was not required to create a new position for Plaintiff when she was injured, *see Shiring*, 90 F.3d at 831, and since Plaintiff was never reassigned to another vacant, funded position that would supplant her letter carrier job, we will consider the "qualified individual" prong with reference to Plaintiff's official position as a letter carrier.

The Third Circuit has found that "[o]ne of the essential functions of a mail carrier is to physically deliver the mail to the people along the route." *Id.*  Although the Third Circuit has not found "casing" mail to be an essential function of a letter carrier's position, it has noted that "[n]ormally, each letter carrier is responsible for casing the mail for his or her own route . . . ." *Id.* at 829.  Plaintiff admits that her medical and physical restrictions make it impossible for her to case or deliver the mail.  Accordingly, we must determine whether any reasonable accommodation would allow Plaintiff to perform the essential duties of a letter carrier, that is, casing and delivering mail.

### 2.   *Reasonable Accommodation*

"An employee can succeed under the Rehabilitation Act only if the employee can demonstrate that a specific, reasonable accommodation would have allowed her to perform the essential functions of her job." *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 232 (3d Cir. 2000) (internal quotation marks omitted).  "Thus, employers are not required to modify the essential functions of a job in order to accommodate an employee." *Id.*  Furthermore, "[a]n employer's obligation to provide a reasonable accommodation does not require the employer to create a new job." *Donahue*, 224 F.3d at 230 (citing *Mengine v. Runyon*, 114 F.3d 415, 417 (3d Cir. 1997)).

17

The parties do not dispute that no amount of accommodation on the part of the USPS would allow Plaintiff to perform her duties as a letter carrier. *See Shiring*, 90 F.3d at 831. Plaintiff testified at her deposition that she assumes that if given a cart and mail that had already been cased by someone else, she would be able to deliver the pre-prepared mail at Olney Plaza, which is a little plaza near Olney Station. (Pl.'s Dep. at 32-33.) However, delivery at Olney Plaza would take only about a half-hour to an hour. (*Id.* at 33.) Moreover, Olney Plaza is a small part of a larger route that is assigned to another letter carrier. (*Id.* at 33-34.) Plaintiff admits that she would not be able to deliver along the entire route, that she cannot case the mail herself, that she has never asked to deliver along the Olney Plaza portion of the route, and that the route belongs to another carrier. (*Id.*) We are satisfied that there is no accommodation that would permit Plaintiff to case and deliver mail.

Furthermore, Plaintiff's request to remain at Olney Station doing CFS work was not, as she argues, a request for "reasonable accommodation." (*See* Doc. No. 20 at 31 ("How can Defendant claim Plaintiff did not request an accommodation when she had an accommodation and did asked [sic] to be allowed to continue performing the CFS duties she was performing for six years[?]").) The rehabilitation position – performing CFS-related work – was not an accommodation because it did not allow Plaintiff to perform the essential functions of her position as a letter carrier. *See Shiring*, 90 F.3d at 831 (finding that "the district court did not err in refusing to consider the non-existent position of 'caser' as an accommodation that would make [the plaintiff] qualified"); *Gantner v. Potter*, No. 03-644, 2007 U.S. Dist. LEXIS 82815, at *9-10 (W.D. Ky. Nov. 7, 2007) (finding that where the position of "Window Clerk Modified" was offered to the plaintiff by the USPS pursuant to FECA, and where there was no evidence

18

indicating that the position would have existed if not for FECA requirements, the position could not be characterized as a "reasonable accommodation" under the Rehabilitation Act); *Rio v. Runyon*, 972 F. Supp. 1446, 1458 (S.D. Fla. 1997) (finding that plaintiff who could not deliver the mail was not entitled to "indefinite temporary light duty" and that "[a]lthough the Postal Service did permit Plaintiff only to case the mail on a temporary basis, that discretionary act does not require the Postal Service to maintain such a position as a reasonable accommodation"); *Sidaris v. Runyon*, 967 F. Supp. 1260, 1267-68 (M.D. Ala. 1997) (finding that where the USPS assigned injured plaintiff to light-duty, which required her to case her route but not deliver mail, the USPS was "not, as a matter of law, required by the [Rehabilitation] Act to assign Plaintiff to permanent light-duty or continuing temporary light-duty position" as a reasonable accommodation because "[a]n employer has no duty to create a new light-duty position in order to accommodate a handicapped employee").  We are satisfied that Plaintiff could not perform the essential functions of her job and that no reasonable accommodation was available.

### 3.   Reassignment

Although an employer is not required to create a new job for a disabled individual, "an employer may be required to transfer an employee to an existing position."  *Donahue*, 224 F.3d at 230 (citing *Mengine*, 114 F.3d at 418; *Shiring*, 90 F.3d at 832); *see also Shiring*, 90 F.3d at 832 (finding that courts must consider "whether reassignment is possible in determining whether an individual seeking relief under the Rehabilitation Act is an otherwise qualified individual").  "The reassignment should be to an already funded, vacant position within the same commuting area, and at the same grade or level."  *Shiring*, 90 F.3d at 832 (citing 29 C.F.R. § 1614.203(g)).  When a plaintiff challenges an employer's failure to transfer, the plaintiff must demonstrate

(1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with reasonable accommodation.  If the employee meets [her] burden, the employer must demonstrate that transferring the employee would cause unreasonable hardship.

*Donahue*, 224 F.3d at 230 (citing *Mengine*, 114 F.3d at 418; *Shiring*, 90 F.3d at 832).

Here, neither party addressed the issue of reassignment.[7]  Plaintiff did not seek reassignment, and Plaintiff does not allege that the USPS failed to transfer or reassign her to another position.  Nor has Plaintiff shown that there were any vacant, funded positions at an equivalent level or position as her letter carrier position.  Rather, the only "accommodation" that Plaintiff seeks is to be permanently assigned to Olney Station performing CFS work for 40 hours per week, plus overtime.  However, as we have already explained, such "accommodation" would effectively require the USPS to create an alternative position for Plaintiff, which it is not required to do.  Even if Plaintiff were challenging the USPS on the basis of a failure-to-transfer, we find that Plaintiff has not carried her burden of demonstrating that there were appropriate vacant, funded positions.  *See Shiring*, 90 F.3d at 832 ("A plaintiff seeking relief under the Rehabilitation Act must demonstrate what reasonable accommodation he or she contends the employer should

_____

[7] In her "Statement of Facts," Plaintiff references reassignment twice.  (Doc. No. 20 at 2, 6 n.2.)  She cites to the handbook for Employee Benefits Injury Compensation Program for the proposition that "[a] current full time employee may be reassigned to a full time career position if his or her job-related medical conditions permit."  (*Id.* (citing Ex. E § 546.23(a)).)  Plaintiff also states: "'Reassignment or reemployment under this subsection must be in compliance with the applicable collective bargaining agreements.  Individuals so reassigned or reemployed must receive all appropriate rights and protection under the newly applicable collective bargaining agreement.'"  (*Id.* (quoting Ex. J § 546.21).)

Plaintiff has not shown that she was reassigned, nor has she shown that she sought reassignment.  To the extent that Plaintiff believes that her rehabilitation positions constituted reassignments under the Rehabilitation Act, we disagree.  Plaintiff's modified positions were created through the USPS's Rehabilitation Program.  Throughout her participation in the Rehabilitation Program, Plaintiff retained the position of "letter carrier."

have made, including an identification of the positions the employer should have considered for reassignment.").

Accordingly, because Plaintiff cannot perform the essential functions of her position, because there is no reasonable accommodation that would allow Plaintiff perform the essential functions of her position, and because Plaintiff has not shown that the USPS failed to reassign her to any appropriate, vacant, funded, existing position, we find that Plaintiff is not a "qualified individual" under the Rehabilitation Act. Therefore, Plaintiff's discrimination claims – disparate treatment, denial of accommodation, and involuntary transfer – under the Rehabilitation Act must fail.

**B.      Retaliation Claim[8]**

Plaintiff claims that her transfer from Olney Station to MOD in March 2007 was in retaliation for Plaintiff's participation in protected activity, that is, filing an EEO complaint in October 2006.[9]  (Doc. No. 20 at 22-23.)  Defendant moves for summary judgment on this claim, arguing that Plaintiff cannot establish a causal connection between her EEO activity and her

_____

[8] Plaintiff's failure to establish that she is a "qualified individual" under the Rehabilitation Act does not preclude her from recovering on a claim of retaliation.  *See Krouse v. Am Sterilizer Co.*, 126 F.3d 494, 498 (3d Cir. 1997) (*cited in Ozlek v. Potter*, 259 Fed. App'x 417, 421 (3d Cir. Dec. 19, 2007) (unpublished)).

[9] Plaintiff lists the following as adverse employment actions suffered as retaliation:  "She was transferred to another work location.  She was not permitted to work overtime.  She had to travel longer to get to work.  She had to start work much earlier, i.e., 3:00 A.M. as supposed [sic] to 6:00 A.M."  (Doc. No. 20 at 23.)  Plaintiff's allegations that she had to travel longer to get to work and to leave for work much earlier are not supported in the record.  Plaintiff's allegation that the USPS retaliated by not permitting her to work overtime does not make any sense.  According to Plaintiff's retaliation theory, the withholding of overtime was not retaliation, but rather the impetus for Plaintiff's complaints, which led to the retaliation by transfer.  Moreover, it is undisputed that after having been moved to MOD, Plaintiff received overtime "almost daily."  (Pl.'s Dep. at 85.)

transfer to MOD because the "transfer occurred long after she filed her EEO complaint, and her supervisors did not transfer her out of her home station earlier despite opportunities to do so." (Doc. No. 15 at 2-3.)

To survive summary judgment on a claim of retaliation under the Rehabilitation Act, a plaintiff must satisfy her burdens under the *McDonnell Douglas* framework:

> To establish a prima facie case of retaliation under the [Rehabilitation Act], a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. . . . If an employee establishes a prima facie case . . . the burden shifts to the employer to advance a legitimate, non-retaliatory reason for it adverse employment action . . . . If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.

*Krouse*, 126 F.3d at 500 (internal citations omitted); *see also Ozlek v. Potter*, 259 Fed. App'x 417, 421-22 (3d Cir. Dec. 19, 2007) (unpublished) (applying *Krouse* retaliation framework to retaliation claim under the Rehabilitation Act). In order to establish a causal connection, a plaintiff must demonstrate either (1) a temporal proximity between the two events that is "unusually suggestive" of retaliation, *see Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004), or (2) timing plus other evidence, such as evidence that the employer engaged in a "pattern of antagonism" with the plaintiff, *see Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895-96 (3d Cir. 1993). In *Williams*, the Third Circuit found that a period of two months was not "unusually suggestive" of retaliation. 380 F.3d at 760. In *Robinson*, the court found that a "pattern of antagonism" existed because the employer engaged in a "constant barrage of written and verbal warnings . . . , inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge."

22

982 F.2d at 895 (internal quotation marks omitted).

We are satisfied that Plaintiff has not demonstrated a causal connection between her protected activity, filing an EEO complaint in October 2006, and her employer's adverse action, transferring her to MOD in March 2007.  Plaintiff argues that

> Plaintiff was transferred to MOD within four months of the filing of the formal EEO Complaint.  However, that was not the end of the contact with EEO.  On January 25, 2007, Supervisor Breslin completed an Affidavit as part of the EEO investigative process.  This affidavit was completed within 61 days, approximately two months, before Plaintiff was involuntarily transferred to MOD.  Let us not also forget, the unjustified Letter of Warning that was issued five days before the involuntary transferred [sic].

(Doc. No. 20 at 24.)  The approximately four to five month period between Plaintiff's filing of an EEO complaint and her transfer is not unduly suggestive of retaliation.  In addition, Plaintiff has provided no evidence of a "pattern of antagonism" that would suggest retaliatory animus on the part of Plaintiff's supervisors.  As Defendant points out, prior to Plaintiff being transferred to MOD but after her filing of the EEO complaint, there were two opportunities for the USPS to transfer an injured employee, such as Plaintiff, out of Olney Station.  (*See* Decl. of J. Breslin ¶¶ 15-19.)  Plaintiff's station manager sent another injured employee both times.  (*Id.*)  Moreover, the Letter of Warning that Plaintiff received days before her transfer was neither unduly suggestive of retaliation in terms of timing, coming as it did approximately five months after Plaintiff's EEO complaint, nor an example of antagonism on the part of her supervisors.  The Letter of Warning was issued in response to Plaintiff's "failure to be regular in attendance" on several dates.  (Doc. No. 15, Ex. U ("Letter of Warning").)  Plaintiff states that these "absences were related to family emergencies."  (Doc. No. 20 at 21.)  Plaintiff has not shown, however, that her absences were excused at the time that she was issued the Letter of Warning,

23

that her supervisors knew that the absences were related to family emergencies, or that the her supervisors knew that the Letter of Warning was unwarranted when it was issued.

In addition, Plaintiff has failed to provide any evidence rebutting Defendant's legitimate, non-retaliatory reasons for transferring Plaintiff.  Defendant explains that Plaintiff's station manager selected Plaintiff to be transferred to MOD because:  there was an unprecedented number of passports to be processed in March 2007; the Philadelphia Postmaster asked for injured employees who were not being used effectively at their stations to be sent to MOD; Olney Station's manager selected Plaintiff and another individual because there was not enough work at Olney Station within their medical restrictions, because he believed that the passport work at MOD would be within their restrictions and provide them with more hours, and because they were the two most junior employees at Olney Station.  (Doc. No. 15 at 26.)

Plaintiff has not shown that this explanation is false and that retaliation was the real reason that Plaintiff was transferred.  Indeed, Plaintiff "does not question that on or about March 2007, Defendant had a need to process Passports.  Plaintiff does question whether it was necessary to send her to perform these duties."  (Doc. No. 20 at 7.)  Plaintiff argues that there was enough work at Olney Station, and as proof offers that "Mr. Bill Isaac, Union Shop Steward at the Olney Station, told Plaintiff that when she was away from Olney Station, other employees performed her duties."  (*Id.*)  Plaintiff does not point to anything in the record that supports this assertion, and we found nothing in the record that supports this contention.  Moreover, even if Plaintiff is correct that there was enough work at Olney Station, Plaintiff has not shown that Defendant's other legitimate, non-retaliatory reasons are false.  Accordingly, we find that Plaintiff's retaliation claim cannot survive summary judgment.

24

**IV.     CONCLUSION**

For all of these reasons, we will grant Defendant's Motion for Summary Judgment.

An appropriate Order will follow.


BY THE COURT:


_____

R. Barclay Surrick, J

25